**JOSEPH MARTIN MCGHEE**
300 W High Country Tr.
Flagstaff, AZ 86005
Email: McGhee.v.Bondi.et.al@gmail.com
(928) 331-0042
*Pro Se Plaintiff*

FILED ___ LODGED
✓ RECEIVED ___ COPY

JUL 0 3 2025

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

# IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Joseph McGhee, | Case No: **CV25-08143-PCT-DJH** |
| Plaintiff, | **VERIFIED COMPLAINT** |
| v. | (Demand for Jury Trial) |
| Pamela Bondi, in her official capacity as United States Attorney General; Daniel Driscoll, in his official capacity as Acting Director of the ATF; City of Flagstaff, a political subdivision of the State of Arizona; Sean Connolly, as an individual and in his official capacity as the City of Flagstaff Chief of Police; Todd Martinet, as an individual and in his official capacity as a Flagstaff Police Officer, | |
| Defendants. | |

**INTRODUCTION**

This civil rights action challenges the constitutionality of 18 U.S.C. § 922(g)(3) and its implementing regulation, 27 C.F.R. § 478.11, which prohibit firearm possession by persons deemed to be an "unlawful user" of any controlled substance. Plaintiff—a law-abiding Arizona resident who is a firearm owner and who lawfully uses one or more controlled substances—challenges a federal regime that criminalizes constitutionally protected conduct through vague laws, arbitrary enforcement, and agency overreach. This case exposes how 18 U.S.C. § 922(g)(3) and 27 C.F.R. § 478.11: **(1)** defy the Second Amendment's text and history under *Bruen*; **(2)** ignore Congress's deliberate limits on federal drug policy; and **(3)** deprive citizens of fundamental rights without due process. Accordingly, Plaintiff brings facial and as-applied constitutional claims under the Second, Fifth, and Tenth Amendments, as well as a statutory claim under the Administrative Procedure Act.

Plaintiff also seeks damages and other relief under 42 U.S.C. § 1983 against the City of Flagstaff and officials of the Flagstaff Police Department, who have denied and continue to deny him possession of his lawfully owned firearms without notice, process, or hearing. This denial is based solely on an unsupported allegation that he is an "unlawful user" of a controlled substance and therefore prohibited person under federal law. That denial—made without legal authority,

procedural safeguards, or any mechanism for appeal—violated Plaintiff's due process rights and reflects an unlawful municipal policy or custom.

Plaintiff respectfully seeks declaratory and injunctive relief, damages, and any further relief this Court deems just and proper.

## PARTIES, JURISDICTION AND VENUE

1.     Plaintiff Joseph McGhee is an adult and an Arizona resident.

2.     Defendant Pamela Bondi is the Attorney General of the United States. She is sued in her official capacity.

3.     Defendant Daniel Driscoll is the Acting Director of the Bureau of Alcohol, Tobacco and Firearms. He is sued in his official capacity.

4.     Defendant City of Flagstaff is a political subdivision of the State of Arizona.

5.     Defendant Sean Connolly is the Chief of the Flagstaff Police Department ("FPD"). Connolly is employed by Defendant City of Flagstaff and is a final policymaker for the purposes of *Monell* liability. He is sued individually and in his official capacity.

6.     Defendant Todd Martinet is employed by the City of Flagstaff as a Detective Sergeant with FPD. He is sued individually and in his official capacity.

7.     This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343, 5 U.S.C. §§ 701–706, and 28 U.S.C. § 2201.

8.     Venue is proper in this District under 28 U.S.C. § 1391(b) and (e), because: **(a)** Plaintiff resides in this District and suffers ongoing harm here due to the enforcement of 18 U.S.C. § 922(g)(3) and 27 C.F.R. § 478.11; **(b)** Federal Defendants reside in Washington, D.C., but conduct nationwide enforcement of the challenged laws and regulations; and **(c)** A substantial part of the events giving rise to these claims occurred in this District, including the denial of Plaintiff's firearm rights by local law enforcement acting under ATF's guidance and/or direction.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

9.     Plaintiff is lawfully prescribed and uses dextroamphetamine, a controlled substance, 21 C.F.R. § 1308.12(d)(1), for the treatment of ADHD. He has been prescribed this medication, at varying dosages, since 2003. For the past two years, Plaintiff's prescription instructs him to "take 1 tablet by mouth 2 times a day." However, at various times and under various circumstances, Plaintiff uses this medication "in a manner other than as prescribed" by his physician. For example, on the days that Plaintiff consumes caffeine, he often—but not always—reduces his dosage of amphetamine so as not to cause him overstimulation. On certain other days, Plaintiff skips his medication altogether. [1]

---

[1] These examples should be construed as illustrative, not exhaustive.

10.     On <u>May 2, 2019</u>, pursuant to order of the Coconino Superior Court, Dr. James Martin Mitchell ("Mitchell"), formerly an Army Green Beret and an Arizona-licensed physician, and who was at the time on release in a felony case in the Coconino Superior Court (No. CR2019-00239) investigated by FPD Detective Sergeant Todd Martinet ("Martinet"), surrendered to FPD for safekeeping two World War II-era bolt-action rifles. On <u>January 9, 2023</u>, Mitchell pleaded guilty to a single undesignated class 6 felony charge of aggravated harassment, a domestic violence offense, and on <u>June 6, 2023</u>, he was sentenced to a 2.5-year term of probation in this case. On <u>December 23, 2024</u>, the Coconino Superior Court granted Mitchell early termination of his probation and designated his conviction as a misdemeanor.

11.     On <u>March 6, 2025</u>, Mitchell contacted FPD by phone to begin the process of retrieving his firearms. During this call, Mitchell spoke to an evidence technician, who informed him that Martinet would first need to approve the release. Thereafter, Mitchell was transferred to Martinet's voicemail, and left him a message regarding the firearms. Following this call, Mitchell emailed Martinet, requesting "the return of [his] rifles and computers immediately," and asking that Martinet please advise him when Mitchell could pick up these items from FPD. Later that day, Martinet replied to Mitchell's email, letting him know that he had received the voicemail messages, "ha[d] a call into the County Attorney's Office for

authorization of evidence release," was "just waiting on that confirmation," and would notify Mitchell when he would be able to retrieve his property.

**12.** On <u>March 11, 2025</u>, having heard nothing from either Martinet or FPD regarding his property, Mitchell sent Martinet another email, again asking when he would be able to retrieve his property.

**13.** On <u>March 13, 2025</u>, Martinet emailed Mitchell, informing him that he had "completed a release for [his] firearms" and that Mitchell would need to "coordinate with one of [FPD's] evidence technicians, Angie Eberhardt or Lexi Pineda (CC'd on this email), to schedule a date and time for release of the firearms."

**14.** On <u>March 21, 2025</u>, Mitchell emailed Ms. Eberhardt and Ms. Pineda, to "set up a time to recover [his] firearms." In this email Mitchell also asked if he could "delegate someone to pick them up for [him]," as he now resided more than 100 miles away and did not have a car.

**15.** On <u>March 24, 2025</u>, Ms. Pineda replied to Mitchell's email, informing him that FPD was "not able to release [the firearms] to anyone but the individual who owns it or to an FFL firearm dealer."

**16.** On <u>March 31, 2025</u>, Plaintiff purchased from Mitchell the two firearms held by FPD for the amount of $5000.00. At that time, Mitchell provided Plaintiff with a bill of sale memorializing the purchase.

17.     On <u>April 9, 2025</u>, Plaintiff emailed Ms. Pineda and Ms. Eberhardt—cc'ing Detective Martinet and Mitchell—the following, which included a copy of the bill of sale from Mitchell to Plaintiff:

> On March 31, 2025, Dr. James Mitchell sold to me the items detailed below. Accordingly, please advise the earliest time I can pick these up from FPD.

18.     Later that day, Martinet replied to Plaintiff's email, stating as follows:

> Unfortunately, the Flagstaff Police Department is unable to accommodate your request. An authorization for release of the firearms in question has been issued for Mr. Mitchell, as he was the documented owner at the time of their seizure. At the advice of legal counsel, we are unable to facilitate any third-party transfer or arrangement regarding the release of these firearms, regardless of any private agreement you may have with Mr. Mitchell.

19.     On <u>May 20, 2025</u>, still not having received from FPD the firearms he purchased from Mitchell more than one month prior, and lacking any procedure or process under FPD's written policies to challenge, contest, or appeal FPD's decision, Plaintiff filed a verified special action complaint in the Coconino Superior Court against the City of Flagstaff and the FPD Chief of Police, Sean Connolly. In his complaint, Plaintiff sought: **(a)** to compel FPD to release his firearms; **(b)** declaratory judgment that FPD's firearms policy violated multiple provisions of Arizona's firearms preemption law; and **(c)** a permanent injunction against any future enforcement of such unlawful policies.

20.     On <u>June 4, 2025</u>, Flagstaff and Connelly, based on a 2022 court filing in an unrelated case involving Plaintiff, alleged in a court filing in the special action

case that Plaintiff was "not legally entitled to take possession of the guns because he has a medical marijuana card, so he presumptively is 'an unlawful user of or addicted to a controlled substance' under Federal law."[2] In support of their contention, Flagstaff and Connelly: **(a)** cited 18 U.S.C. § 922(g)(3); and **(b)** included as an exhibit a September 21, 2011 guidance letter from ATF setting forth that medical marijuana users were prohibited possessors under § 922(g)(3), and which cited (in part) 27 C.F.R. § 478.11's definition of an "unlawful user" of a controlled substance.

21.    Because Flagstaff and Connelly are correct—as stated in their filing—that "finding Federal law unconstitutional is beyond the jurisdiction of [the Coconino Superior Court]," Plaintiff now brings this Complaint in federal court, where no such jurisdictional impediment exists.

## LEGAL BASIS OF DECLARATORY JUDGMENT CLAIMS

This Complaint challenges 18 U.S.C. § 922(g)(3) and its enforcement on four independent grounds: **(1)** vagueness—the statute and ATF's rule leave citizens guessing what conduct is banned; **(2)** *Bruen* failure—no historical analogue supports disarming non-violent drug users; **(3)** federalism violation—

---

[2] Plaintiff neither confirms nor denies these allegations.

ATF overrides state medical programs Congress protected; and **(4)** APA violations—27 C.F.R. § 478.11 is arbitrary, capricious, and *ultra vires*.

## I.    18 U.S.C. § 922(g)(3) IS UNCONSTITUTIONALLY VAGUE

The federal prohibition on firearm possession by "unlawful users" of controlled substances suffers from fatal vagueness at every level. From its undefined core term to its erratic enforcement, the statute fails to provide either fair notice or consistent application, violating fundamental due process principles.

### *"Unlawful User"—A Non-Existent Crime Under Federal Law*

The text of § 922(g)(3) prohibits firearm possession by anyone "who is an unlawful user of or addicted to any controlled substance" but conspicuously fails to define what transforms a person into an "unlawful user." While the statute references the Controlled Substances Act ("CSA"), the CSA only criminalizes unauthorized: **(1)** manufacture, distribution, or dispensing; **(2)** possession with intent to manufacture, distribute or dispense; and **(3)** "simple possession"; of a controlled substance, 21 U.S.C. §§ 841—844, nothing under the CSA (or Title 18) criminalizes the unauthorized *use* of a controlled substance. *See* 21 U.S.C. §§ 801—971.

As courts have recognized: "In creating the classification 'unlawful user' as one category of persons not entitled to possess firearms, Congress intended to refer to any law federal, state, or municipal making the use of narcotics unlawful."

*United States v. Ocegueda,* 564 F.2d 1363, 1365 (9th Cir. 1977). Yet this very approach reveals the term's fatal flaw—it depends entirely on external laws that may or may not exist. As Judge Roth observed in *United States v. Safehouse:* "'*Using* a controlled substance' is not 'unlawful' under federal law; *possessing* it is." 985 F.3d 225, 253 (3d Cir. 2021) (Roth, J., dissenting in part and dissenting in judgment) (emphases added).

This view has been repeatedly confirmed across circuits, with the Ninth Circuit emphasizing "there is no federal criminal statute prohibiting using or being under the influence of a controlled substance," *Nunez-Reyes v. Holder,* 646 F.3d 684, 708 (9th Cir. 2011) (Pregerson, J., dissenting, joined by Fletcher, J.), and the Fourth Circuit noting "[f]ederal law does not criminalize the use or consumption of a controlled substance," *United States v. Glover,* No. 21-4556, 2023 WL 3944375, at *8 (4th Cir. June 12, 2023).

All this creates a statutory void where conduct that is perfectly legal under federal law (mere use of a controlled substance) *and* state law[3] not only somehow becomes disqualifying for a constitutional right,[4] but is also magically (and

---

[3] Such as medical or adult recreational marijuana use.

[4] *But see New York State Rifle & Pistol Ass'n, Inc. v. Bruen,* 597 U.S. 1, 70 (2022) (the Second Amendment "is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'" (quoting *McDonald v. City of Chicago, Ill.,* 561 U.S. 742, 780 (2010))).

obviously unconstitutionally) transformed into a serious federal crime. *See, e.g., United States v. Bellamy,* 682 F. App'x 447 (6th Cir. 2017) (affirming § 922(g)(3) conviction notwithstanding that defendant possessed a medical marijuana card from Michigan, as marijuana is Schedule I controlled substance under federal statute); 18 U.S.C. § 924(a)(8) (any person who violates § 922(g)(3) "shall be fined under this title, imprisoned for not more than *15 years*, or both.") (emphasis added).

But even where a state has criminalized the mere *use* of a particular CSA-scheduled drug[5] such that the "unlawful" part of "unlawful user" could *potentially* be applied constitutionally in a § 922(g)(3) prosecution, the statutory vacuum still exists as to the "user" side of the coin—and remains just as troubling. Not only does § 922(g)(3)'s implementing regulation, 27 C.F.R. § 478.11, fail to mitigate this vagueness, it actually *aggravates* it. Worse yet, § 478.11 sweeps so broadly that even persons who are lawfully prescribed a controlled substance could still be classified as an "unlawful user" under its plain language.

---

[5] *See e.g.,* A.R.S. § 13-3407(A)(1) ("A person shall not knowingly ... use a dangerous drug.") (Ariz.); H&S § 11550(a) ("A person shall not use, ... any [specified] controlled substance...") (Cal.); I.C. § 37-2732C(a) ("[I]t is unlawful for any person ... to use ... any [specified] controlled substance") (Idaho); N.R.S. § 453.411(1) ("It is unlawful for a person knowingly to use ... a controlled substance...") (Nev.).

**Section 922(g)(3): Vague, or <u>Really</u> Vague?**

Faced with a legislative void, ATF stepped in with 27 C.F.R. § 478.11, creating a patchwork of standards that only magnify the statute's constitutional defects. The regulation declares an "unlawful user of or addicted to any controlled substance" as:

> A person who uses a controlled substance and has lost the power of self-control with reference to the use of controlled substance; and any person who is a current user of a controlled substance in a manner other than as prescribed by a licensed physician.

27 C.F.R. § 478.11. In further defining what constitutes an "unlawful user," the rule 'clarifies' that:

> Such use is not limited to the use of drugs on a particular day, or within a matter of days or weeks before, but rather that the unlawful use has occurred recently enough to indicate that the individual is actively engaged in such conduct. A person may be an unlawful current user of a controlled substance even though the substance is not being used at the precise time the person seeks to acquire a firearm or receives or possesses a firearm. An inference of current use may be drawn from evidence of a recent use or possession of a controlled substance or a pattern of use or possession that reasonably covers the present time, e.g., a conviction for use or possession of a controlled substance within the past year; multiple arrests for such offenses within the past 5 years if the most recent arrest occurred within the past year; or persons found through a drug test to use a controlled substance unlawfully, provided that the test was administered within the past year.

Numerous problems with this language are immediately apparent. *First*, were it not bad enough that absolutely nothing under the CSA (or any other provision of the U.S. Code) criminalizes the use of a controlled substance *without*

a prescription, § 478.11 appears to create out of thin air the brand new crime of using a controlled substance *with* a prescription if it is used "in a manner other than as prescribed by a licensed physician." 27 C.F.R. § 478.11.

Let's ignore for a moment the fact that ATF lacks *any* constitutional power to create new criminal laws—especially having nothing to do with alcohol, tobacco, firearms, or explosives *and* which would clearly fall under the ambit of the Drug Enforcement Administration. Does § 478.11's "in a manner other than as prescribed" provision mean that *any* use of a prescribed controlled substance that does not *exactly* comport with the "directions for use" appearing on the prescription's label[6] is a crime? Maybe it is, and maybe it isn't—the point is, no one really knows. In either case, § 478.11 is unconstitutionally vague.

*Second*, far from providing any guidance on what conduct § 922(g)(3) specifically prohibits or to whom it applies, § 478.11's definition of "unlawful user" is entirely vague. It fails to provide any objective, ascertainable standard for determining: **(1)** what constitutes 'use' (frequency, quantity, or circumstances); **(2)** how "recently" the use must have occurred; or **(3)** what "actively engaged" means.

---

[6] *See* 21 C.F.R. § 1306.05 ("All prescriptions for controlled substances shall be dated as of, and signed on, the day when issued and shall bear the full name and address of the patient, the drug name, strength, dosage form, quantity prescribed, *directions for use*, and the name, address and registration number of the practitioner.") (emphasis added).

This is the exact problem identified more than two decades ago by Judge DeMoss in *United States v. Herrera*:

> There is nothing from which a court or jury can determine what quantities of what controlled substances, in what time frame on what occasions, and with what side effects are necessary to constitute an unlawful user.

313 F.3d 882, 889 (5th Cir. 2002) (DeMoss, J., dissenting) (cleaned up).

Such a standardless definition violates the Due Process Clause, because a "crime 'must be defined with appropriate definiteness" and with "ascertainable standards of guilt." *Winters v. New York,* 333 U.S. 507, 515–16 (1948) (citations omitted). "[V]agueness may be from uncertainty in regard to persons within the scope of the act, or in regard to the applicable tests to ascertain guilt." *Id.* (cleaned up). Here, we have both. *Herrera*, 313 F.3d at 889 (DeMoss, J., dissenting). And because "unlawful user" lacks temporal boundaries or quantitative thresholds, § 478.11 leaves citizens to guess whether behavior—even from years ago—might have transformed them into a felon. This is textbook unconstitutional vagueness.

*Third*, § 478.11's "inference of current use" sweeps so broadly that it might also encompass, *inter alia*: **(1)** a false positive drug test taken within the past year; or **(2)** being arrested more than once for possession of a controlled substance during consecutive years, even if the charges were later dismissed *or the person was acquitted. See* 27 C.F.R. § 478.11. But does it? Again, no one really knows—

14

at least not until they're prosecuted for their false positive drug test or their dismissed criminal charges. The rule certainly makes no distinction.

Essentially, this regulatory morass creates questions no ordinary person can answer: Does smoking marijuana once per month create a disqualification? How about twice? Does reducing a dose of Vicodin due to side effects, without first getting 'permission' from the prescriber, constitute a felony if the person also possesses a firearm? What about a person who regularly takes their daily dose of amphetamine ADHD medication all at once, instead of in two divided doses as directed, so that they don't have to carry their entire prescription with them to work for their next dose? Can "[a]n inference of current use … be drawn," 27 C.F.R. § 478.11, where a person is a current subscriber to High Times Magazine and regularly listens to Snoop Doggy Dogg's albums?

The Due Process Clause prohibits laws that "fail[] to give ordinary people fair notice of the conduct it punishes, or [are] so standardless that it invites arbitrary enforcement." *Johnson v. United States,* 576 U.S. 591, 595-96 (2015) (citation omitted). Section 922(g)(3) violates this principle at every turn and has spawned precisely the kind of erratic enforcement the Constitution forbids: ad hoc determinations made by police and prosecutors completely unencumbered by statutory boundaries.

This inevitably leads to absurd disparities, where citizens unknowingly lose their Second Amendment rights based on ATF's sub silentio exceptions to the

Constitution that it never had any authority to impose in the first place.[7] This patchwork violates the "well-recognized requirement" that laws must provide clear standards "consonant alike with ordinary notions of fair play and the settled rules of law." *Johnson,* 576 U.S. at 595 (quoting *Connally v. General Constr. Co.,* 269 U.S. 385, 391 (1926)).

Furthermore, these vague standards and severe penalties—*up to 15 years imprisonment*, 18 U.S.C. § 924(a)(8)—create an impermissible chilling effect on the exercise of constitutional rights. When individuals are unable to discern what conduct might render them felons under § 922(g)(3), they face an unconstitutional choice: either refrain from lawful activities protected by the Second Amendment, or risk unwittingly violating a federal law—depending on the whims of police and prosecutors. This Hobson's choice—forcing Americans to gamble with their liberty when attempting to exercise fundamental rights—epitomizes a due process violation.

When a law "threatens to inhibit the exercise of constitutionally protected rights," its vagueness becomes particularly intolerable. *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.,* 455 U.S. 489, 499 (1982). Section 922(g)(3) squarely fits the bill for intolerability.

---

[7] All this while raging alcoholics conveniently face no restrictions.

## II.   *BRUEN*'S HISTORICAL TEST DEMOLISHES 18 U.S.C. § 922(g)(3)

The Supreme Court's decision in *Bruen* fundamentally reshaped Second Amendment jurisprudence by establishing a singular test: modern firearm regulations must align with the nation's historical tradition of gun regulation from 1791–1868. *Bruen,* 597 U.S. at 4. This framework leaves § 922(g)(3)'s prohibition on "unlawful users" fatally exposed—there is not a single historical analogue that justifies disarming non-violent individuals for mere drug use.

### Drug Laws: A 20th Century Invention

Prior to the 20th century, neither federal nor state laws disarmed cannabis users (or users of *any* drug) because cannabis itself remained unregulated until the 1906 Pure Food and Drug Act,[8] which merely required *labeling* rather than imposing any possession or use restrictions.[9] It wasn't until 1937—under the Marihuana Tax Act—that the importation, cultivation, possession, and/or distribution of cannabis was first regulated.[10] For the first 161 years of this country's history, there was not a single federal law that in any manner regulated the possession or use of cannabis. And it wasn't until the Gun Control Act of

---

[8] *See* Pub. L. 59-384, 34 Stat. 768.

[9] *Id.*

[10] Pub. L. No. 75-238, 50 Stat. 551.

17

1968,[11] enacted 192 years after this nation's founding, that there was *any* law—state or federal—stripping cannabis users of their right to possess firearms.

Moreover, the modern law's irrational distinctions only compound its glaring constitutional infirmities. While § 922(g)(3) disarms *all* cannabis users—including those authorized under their respective state law—it conspicuously exempts alcoholics despite their dramatically higher propensity for violence.[12] Such glaring inconsistency confirms that the provision reflects contemporary policy judgments rather than historical tradition—Supreme Court has made clear is not permitted in the Second Amendment context. *D.C. v. Heller,* 554 U.S. 570, 636 (2008) ("[T]he enshrinement of constitutional rights necessarily takes certain policy choices off the table.").

---

[11] Pub. L. No. 90-618.

[12] The most recent Centers for Disease Control (CDC) data indicates an annual average of 7,037 homicides attributable to alcohol. *See* CDC, *Alcohol and Public Health: Alcohol-Related Disease Impact (ARDI)* (2020-2021); *see also* Thor Norström, *Alcohol and homicide in the United States—is the link dependent on wetness?,* 30:5 DRUG ALCOHOL REV. 458–465 (Sept. 2011) (finding that a 1-litre increase in annual per capita consumption is associated with an increase in homicides of between 6% and 10%). *Cf.* Robert G. Morris et al, *The Effect of Medical Marijuana Laws on Crime: Evidence from State Panel Data, 1990-2006,* 9:3 PLOS ONE (2014) ("[M]edical marijuana laws were not found to have a crime exacerbating effect on any of the seven crime types. On the contrary, our findings indicated that MML precedes a reduction in homicide and assault.").

*The Tide is Turning*

Crucially, lower courts have already begun applying these principles to invalidate § 922(g)(3). In *Range v. Att'y Gen. United States of Am.,* the Third Circuit held that non-violent felons could not be categorically disarmed. 69 F.4th 96, 98 (3d Cir. 2023), cert. granted, judgment vacated sub nom, 144 S. Ct. 2706 (2024).[13] In *United States v. Daniels*, the Fifth Circuit struck down the statute as applied to a marijuana user, observing the complete lack of historical support for such restrictions:

> As applied to Daniels, § 922(g)(3) is a significantly greater restriction of his rights than were any of the 19th-century laws. Although the older laws' bans on "carry" are likely analogous to § 922(g)(3)'s ban on "possess[ion]," there is a considerable difference between someone who is actively intoxicated and someone who is an "unlawful user" under § 922(g)(3).

77 F.4th 337, 347–48 (5th Cir. 2023), *cert. granted, judgment vacated,* 144 S. Ct. 2707 (2024).[14] In *United States v. Harrison,* the district court found that § 922(g)(3), as applied to a marijuana user, "unconstitutionally infringe[d] upon his fundamental right to possess a firearm, in violation of the Second Amendment." 654 F. Supp. 3d 1191, 1193 (W.D. Okla. 2023).

---

[13] *Range* was remanded to the Third Circuit "for further consideration in light of *United States v. Rahimi,*" 144 S.Ct. 1889 (2024).

[14] *Daniels* was likewise remanded to the Fifth Circuit "for further consideration in light of" *Rahimi.*

Ultimately, § 922(g)(3) represents precisely the kind of novel firearm regulation that *Bruen* condemns. With no roots in the nation's historical tradition and no coherent connection to the types of dangers the Founders sought to address, the statute cannot withstand constitutional scrutiny. As courts increasingly recognize, the Second Amendment's text and history provide no basis for disarming individuals whose conduct poses no analogue to the limited class of "dangerous" persons historically excluded from gun ownership.

## III. AS APPLIED TO STATE-AUTHORIZED MEDICAL CANNABIS USERS, 18 U.S.C. § 922(g)(3) VIOLATES FEDERALISM PRINCIPLES

The federal government's enforcement of § 922(g)(3) against state-compliant medical cannabis users creates an unsustainable constitutional conflict that undermines our system of dual sovereignty. This provision, as applied through ATF's regulatory regime, directly contravenes Congress's express policy of non-interference with state medical cannabis programs while violating core federalism principles that have guided our republic since its founding.

Since 2014, Congress has included annual appropriations riders—most recently in § 531 of the Consolidated Appropriations Act, 2024—that expressly prohibit the Department of Justice from using funds to prosecute either state-legal medical marijuana programs or individuals complying with such state laws. *See United States v. McIntosh,* 833 F.3d 1163, 1178 (9th Cir. 2016). This deliberate

legislative choice represents far more than budgetary discretion; it constitutes an affirmative policy decision to respect state sovereignty in matters of medical treatment and public health.

Despite this clear congressional directive, ATF persists in classifying state-authorized medical cannabis patients as "unlawful users" under 27 C.F.R. § 478.11—threatening criminal prosecution to deny these individuals their Second Amendment rights. This creates precisely the type of executive overreach the Framers sought to prevent—where an administrative agency nullifies both state law and congressional appropriations riders through regulatory fiat. The Controlled Substances Act itself anticipates this federalism balance, wherein it explicitly disclaims preemption unless there exists a "positive conflict" with state law. 21 U.S.C. § 903. Can such conflict rationally exist when Congress has repeatedly declined to enforce federal prohibitions against compliant medical users?

The current enforcement regime creates constitutional absurdities that would shock the Framers: A patient can be fully compliant with state MMJ laws, enjoy express protection from federal prosecution under congressional appropriations riders, yet still be stripped of fundamental rights based on the same lawful conduct. In this context, ATF has transformed into exactly what the Tenth Amendment forbids—a federal actor commandeering state regulatory

schemes to achieve Washington's policy goals. *Printz v. United States,* 521 U.S. 898, 935 (1997).

Ultimately, such an enforcement scheme cannot survive constitutional scrutiny. Where Congress has deliberately declined to preempt state medical cannabis programs, where no "positive conflict" exists under § 903, and where executive agencies seek to accomplish through backdoor gun regulations what Congress has expressly declined to do through criminal prohibitions, our federalism principles demand judicial intervention. The result is clear: § 922(g)(3) cannot constitutionally be applied to deprive state-authorized medical cannabis patients of their Second Amendment rights.

## IV. ATF'S DEFINITION OF "UNLAWFUL USER" IN 27 C.F.R. § 478.11 IS UNCONSTITUTIONALLY VAGUE AND VIOLATES THE SECOND AMENDMENT BY DISARMING INDIVIDUALS FOR LAWFUL, NON-CRIMINAL CONDUCT

The ATF's regulatory definition of "unlawful user" represents a trifecta of constitutional violations, combining statutory overreach with due process violations and Second Amendment infringements. This administrative creation transforms minor medical decisions into felony conduct while lacking any meaningful anchor in law, history, or common sense.

### The ATF Invented a Crime Congress Refused to Create

The Fifth Amendment's guarantee of due process requires that criminal laws provide clear notice of prohibited conduct, preventing arbitrary enforcement. *Johnson,* 576 U.S. at 595. The government violates this guarantee when it

enforces laws "so vague that [they] fail[] to give ordinary people fair notice of the conduct [they] punish[], or so standardless that [they] invite[] arbitrary enforcement." *Johnson,* 576 U.S. at 595.

The ATF's rule commits both sins simultaneously and the CSA's text reveals the fatal flaw in the ATF's approach: While 21 U.S.C. § 844(a) criminalizes possession and distribution, it conspicuously omits any prohibition on mere "use." Congress in fact reinforced this distinction by separating "*illegal* importation, manufacture, distribution, and possession" from "*improper* use," 21 U.S.C. § 801(2) (emphases added)—signaling its deliberate choice not to criminalize the latter. *See Safehouse,* 985 F.3d at 253 ("'Using a controlled substance' is not 'unlawful' under federal law; possessing it is.") (dissent).

As discussed in more detail in the next section, this statutory silence matters profoundly after *Loper Bright,* which eliminated *Chevron* deference and restored courts' duty to independently assess whether agencies have acted within their congressionally granted authority. *Loper Bright Enters. v. Raimondo,* 603 U.S. 369, 395–96 (2024). Here, Congress never authorized ATF to transform § 922(g)(3)'s undefined 'unlawful user' term into a sweeping prohibition that encompasses *lawful* medical decisions. The regulation thus stands as a textbook example of *ultra vires* agency action and ultimately represents everything the Constitution guards against: an unelected agency inventing new prohibitions,

enforcing them inconsistently, and depriving Americans of fundamental rights without due process or historical justification.

The bottom line? Section 478.11 cannot survive scrutiny under *Bruen*, *Loper Bright*, or even basic principles of fair notice—it deserves invalidation on all three grounds. As federal courts have begun recognizing, ATF's strained regulatory overreach stands on shaky constitutional ground that grows weaker by the day.

## V.   27 C.F.R. § 478.11 EXCEEDS ATF'S STATUTORY AUTHORITY AND IS ARBITRARY AND CAPRICIOUS UNDER THE APA

The ATF's definition of "unlawful user" represents a textbook case of administrative overreach that cannot survive scrutiny under the Administrative Procedure Act. This regulatory house of cards collapses under three fatal flaws: it lacks congressional authorization, ignores critical evidence, and creates irrational distinctions that defy both logic and law.

### Criminalization of Mere "Use" Contravenes the CSA

Congress spoke clearly in the Controlled Substances Act about what conduct it meant to regulate—and "using" wasn't it. While the CSA carefully prohibits possession, distribution, and manufacturing of controlled substances, 21 U.S.C. §§ 841—844, it conspicuously omits any mention of criminalizing mere "use." This statutory silence speaks volumes.

Perhaps ATF simply forgot that "[t]he interpretation of the meaning of statutes, as applied to justiciable controversies," is "exclusively a judicial function." *Loper Bright,* 603 U.S. at 387 (collecting cases). *See* 5 U.S.C. § 706. Because that's precisely what ATF attempted here—rewriting § 922(g)(3) to cover conduct that Congress deliberately left untouched. The result? An *ultra vires* regulation that transforms the ATF from law enforcer to lawmaker, violating fundamental separation of powers principles.

### The Congressional Appropriations Rider Matters Here

While it's true that 27 C.F.R. § 478.11 predates Congress's medical marijuana appropriations riders, this temporal fact actually strengthens the arbitrary and capricious challenge because the ATF has persistently refused to update its rule in light of Congress's subsequent, repeated expressions of legislative intent. The agency's decade-plus failure to reconcile its regulation with evolving federal policy represents its own flavor of arbitrariness that violates the APA's requirement of reasoned decision-making.

But an agency's rulemaking obligations don't end at promulgation, because they also have an ongoing duty to ensure regulations remain consistent with congressional intent. *Am. Iron & Steel Inst. v. E.P.A.,* 115 F.3d 979, 1007 (D.C. Cir. 1997) (agency "ha[s] an obligation to deal with newly acquired evidence in some reasonable fashion."). Congress's annual renewal of medical marijuana

protections since 2014 constitutes precisely this type of changed circumstance that demands regulatory reassessment.

Even if § 478.11's original rulemaking was procedurally proper for its time, Congress's subsequent appropriations riders (not even to mention *Bruen*) operate as powerful subsequent legislative history that the ATF has inexplicably ignored. Congressional inaction "is a particularly dangerous ground on which to rest an interpretation of a prior statute." *Pension Ben. Guar. Corp. v. LTV Corp.,* 496 U.S. 633, 650 (1990). Here, we have the opposite problem: repeated congressional action through appropriations that the ATF has stubbornly resisted incorporating into its regulatory framework.

The ATF's inaction becomes even more indefensible when viewed through the "logical outgrowth" doctrine from *Shell Oil Co. v. E.P.A.,* 950 F.2d 741, 747 (D.C. Cir. 1991). *See Ohio v. Env't Prot. Agency,* 603 U.S. 279, 306 (2024) ("'logical outgrowth' challenges typically are cognizable under the Administrative Procedure Act"). While that doctrine typically applies to notice-and-comment requirements, *Shell Oil Co.,* 950 F.2d at 747, its underlying principle—that regulations must evolve logically from their statutory and factual premises—applies with equal force here. The seismic shift in federal marijuana policy represented by annual appropriations riders constitutes new factual premises that demand regulatory reevaluation.

Now that 38 states have legalized medical marijuana—with Congress repeatedly prohibiting interference with these programs—the rule's continued application to state-compliant users creates precisely the type of "unfair surprise" the APA prohibits. *See Christopher v. SmithKline Beecham Corp.,* 567 U.S. 142, 156 (2012). This temporal gap actually makes the case for vacatur stronger, not weaker. As the Ninth Circuit very recently made very clear, vacatur is the proper remedy when an:

> agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Montana Wildlife Fed'n v. Haaland,* the 127 F.4th 1, 36 (9th Cir. 2025).

Here, ATF's failure to reconsider its rule in light of Congress's clear policy shift warrants vacatur under this principle.

### The ATF's Rule Embodies Arbitrary and Capricious Decisionmaking

The CSA classifies drugs, chemicals, and substances into five schedules (I-V) based on their potential for abuse, medical utility, and safety, 21 U.S.C. § 812:

1. Schedule I substances are considered the most dangerous, with a high potential for abuse and no accepted medical use in the U.S. *Id.* § 812(b)(1). Examples include PCP, heroin, LSD, marijuana, and ecstasy (MDMA). 21 C.F.R. § 1308.11.

2.   Schedule II substances also have a high potential for abuse but have recognized medical uses under strict regulations. 21 U.S.C. § 812(b)(2). These drugs may lead to severe psychological or physical dependence. *Id.* Examples include cocaine, methamphetamine, oxycodone, fentanyl, and amphetamine, 21 C.F.R. § 1308.12, which Plaintiff uses by prescription.

3.   Schedule III substances have a moderate to low potential for abuse and an accepted medical use. 21 U.S.C. § 812(b)(3). Abuse may lead to moderate physical dependence or high psychological dependence. *Id.* Examples include ketamine, anabolic steroids, and products containing less than 90 milligrams of codeine per dose (e.g., Tylenol with codeine). 21 C.F.R. § 1308.12.

4.   Schedule IV substances have an even lower potential for abuse compared to Schedule III drugs and are widely used in medical treatment. 21 U.S.C. § 812(b)(4). Examples include Xanax (alprazolam), Valium (diazepam), Ambien (zolpidem), and tramadol. 21 C.F.R. § 1308.14. While they have a lower risk of dependence, misuse can still lead to physical or psychological addiction. 21 U.S.C. § 812(b)(4)(C).

5.   Schedule V substances have the lowest potential for abuse, 21 U.S.C. § 812(b)(4)(C), and consist primarily of preparations containing

limited quantities of certain narcotics, 21 C.F.R. § 1308.15, often used for antitussive purposes. Examples include cough syrups with small amounts of codeine (e.g., Robitussin AC) and pregabalin (Lyrica). *Id.*

Clearly, many of these drugs "have a useful and legitimate medical purpose and are necessary to maintain the health and general welfare of the American people." 21 U.S.C. § 801(1). And as the schedules make clear, certain drugs are *objectively* more dangerous than others. PCP, for example, is undeniably more dangerous than Ambien. Nevertheless, § 478.11 treats all 'unlawful use' the same.

But under § 478.11, someone who keeps an AK-47 with them while they spend all day, every day, smoking PCP in a crack house, is a prohibited possessor under § 922(g)(3). Likewise, the person who has a CCW permit, is employed, has a family, and spends their spare time volunteering at an animal shelter, but who takes their spouse's prescribed Ambien a few times per month when they have a hard time falling asleep, is also a prohibited possessor under § 922(g)(3). You see the problem.

The regulation collapses critical distinctions between different types of drug use, treating a single instance of borrowing a low-dose Schedule V medication the same as daily PCP abuse. But the CSA itself recognizes varying degrees of danger by classifying drugs into five schedules. And yet the ATF's rule flattens these distinctions into a one-size-fits-all prohibition. This irrational overbreadth sweeps in countless individuals who *objectively* pose no threat to

public safety, all while ATF has never explained why Congress's deliberate risk classifications should be ignored in determining who is an "unlawful user."

The CSA establishes five unique schedules of controlled substances based on their potential for abuse, medical utility, and safety for a reason.

***Vacatur is Especially Appropriate Here***

Under the APA, courts must set aside agency actions that: **(1)** exceed statutory authority; **(2)** are arbitrary and capricious; or **(3)** are "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2). ATF's rule checks all three boxes with unmistakable clarity. It represents precisely the kind of "highly consequential power beyond what Congress could reasonably be understood to have granted" the Supreme Court warned against in *W. Virginia v. Env't Prot. Agency*—an agency asserting power over a fundamental question of "economic and political significance," 597 U.S. 697, 701 (2022), without "clear congressional authorization," *id.* at 723.

The proper remedy is clear: vacatur of 27 C.F.R. § 478.11 and an injunction against its enforcement.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of the Fifth Amendment
### *Void for Vagueness Challenge*
### (Against Defendants Bondi and Driscoll)
### Declaratory Judgment, 28 U.S.C. § 2201

22.     Plaintiff re-alleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

23.     The Fifth Amendment to the United States Constitution prohibits the federal government from depriving any person of life, liberty, or property without due process of law. A core component of this guarantee is the requirement that criminal statutes must provide fair notice of what conduct is prohibited and establish clear standards to prevent arbitrary and discriminatory enforcement.

24.     18 U.S.C. § 922(g)(3) makes it unlawful for any person "who is an unlawful user of or addicted to any controlled substance" to possess or receive a firearm. A violation of this provision is punishable by up to fifteen years imprisonment. 18 U.S.C. § 924(a)(8).

25.     The statute does not define the term "unlawful user," and the Controlled Substances Act likewise fails to criminalize mere use of a controlled substance. Instead, it criminalizes only manufacture, possession, and distribution. 21 U.S.C. §§ 841–844.

26.     The term "unlawful user" is inherently vague. It lacks an objective, knowable definition and does not specify: **(a)** the quantity or frequency of drug use

that triggers liability; **(b)** the temporal proximity between drug use and firearm possession that establishes a violation; or **(c)** the types of conduct—such as minor deviations from prescribed use of medication—that qualify as "unlawful."

27.    The ATF attempted to define "unlawful user" via regulation at 27 C.F.R. § 478.11. This regulation sets forth broad, ambiguous, and inconsistent criteria that only compound the statute's vagueness. It states that "current use" need not be contemporaneous with firearm possession, and that an "inference" may be drawn from such things as a positive drug test within the past year or multiple arrests—even if no conviction resulted.

28.    The regulation further defines unlawful use to include any "current use … in a manner other than as prescribed by a licensed physician." This fails to clarify whether deviating from dosage instructions (e.g., skipping a dose due to caffeine consumption) transforms a person into a felon, or whether past lawful use can nonetheless trigger present disqualification.

29.    The combination of vague statutory language and an expansive, indeterminate regulatory definition leaves ordinary citizens to guess whether and when their conduct might violate § 922(g)(3). It also invites arbitrary enforcement by permitting law enforcement agencies to apply ad hoc and subjective criteria.

30.    These deficiencies are particularly severe in the context of laws that restrict constitutionally protected conduct—namely, the right to keep and bear arms under the Second Amendment. Laws that chill the exercise of fundamental

rights must be subject to heightened scrutiny for vagueness. *See Village of Hoffman Estates v. Flipside,* 455 U.S. 489, 499 (1982).

31.     Courts across jurisdictions have recognized that the statute's imprecise language raises grave due process concerns. *See United States v. Herrera,* 289 F.3d 311, 326 (5th Cir. 2002) (DeMoss, J., dissenting) ("There is nothing from which a court or jury can determine what quantities of what controlled substances, in what time frame on what occasions ... are necessary to constitute an unlawful user."); *United States v. Glover,* 2023 WL 3944375, at *8 (4th Cir. June 12, 2023) ("Federal law does not criminalize the use or consumption of a controlled substance.").

32.     The statutory and regulatory scheme fails both prongs of the void-for-vagueness doctrine as articulated in *Johnson*: **(a)** it does not provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits; and **(b)** it authorizes or even encourages arbitrary and discriminatory enforcement. 576 U.S. 591 (2015).

33.     Plaintiff, a lawfully prescribed user of dextroamphetamine for ADHD, cannot discern whether his adaptive dosing practices—which include sometimes skipping or reducing a dose to accommodate dietary or health considerations—render him an "unlawful user." Nor is there any clear legal process by which he can obtain certainty about whether his lawful conduct will disqualify him from possessing firearms.

34.     Defendants Bondi and Driscoll, acting under color of federal law, enforce 18 U.S.C. § 922(g)(3) and 27 C.F.R. § 478.11 through various administrative and investigatory actions that threaten Plaintiff with criminal prosecution and continued deprivation of his Second and Fifth Amendment rights.

35.     Because § 922(g)(3) is impermissibly vague both facially and as applied to Plaintiff, it violates the Due Process Clause of the Fifth Amendment and is unenforceable.

**COUNT II**
**Violation of the Second Amendment**
*Facial Challenge to 18 U.S.C. § 922(g)(3)*
**(Against Defendants Bondi and Driscoll)**
**Declaratory Judgment, 28 U.S.C. § 2201**

36.     Plaintiff re-alleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

37.     The Second Amendment to the United States Constitution provides: "A well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed." U.S. Const. amend. II.

38.     In *New York State Rifle & Pistol Association v. Bruen,* 597 U.S. 1 (2022), the Supreme Court announced the controlling test for evaluating whether modern gun regulations are constitutionally permissible under the Second Amendment.

39.     Under *Bruen*, the government bears the burden to justify any modern firearm restriction by demonstrating that the regulation is consistent with "this Nation's historical tradition of firearm regulation." *Id.* at 17. The Court made clear

that "the Second Amendment is not a second-class right" and that interest balancing is categorically prohibited. *Id.* at 70.

40.    Section 922(g)(3) criminalizes possession or receipt of a firearm by any person who is "an unlawful user of or addicted to any controlled substance." The statute applies categorically, regardless of the nature or frequency of drug use, and without requiring a finding of dangerousness, mental incapacity, or criminal conviction.

41.    Section 922(g)(3) imposes a complete prohibition on the exercise of Second Amendment rights by a broad and ill-defined class of individuals—those whom the government deems "unlawful users" of controlled substances—without regard to individualized risk or historical precedent.

42.    The statute is not limited to those currently intoxicated, actively impaired, or otherwise dangerous. Instead, it encompasses individuals who engage in even isolated or minor acts of controlled substance use—whether lawful under state law or otherwise—including those who deviate from a prescription or have an outdated arrest.

43.    The Supreme Court in *Bruen* expressly rejected the "means-end" scrutiny framework applied by lower courts before 2022. *Id.* at 24. Under the proper test, the government must identify a "historical analogue" to justify its restriction, rooted in the Founding-era or at the latest in the Reconstruction-era tradition. *Id.* at 30.

44.     The Founders never disarmed citizens for consuming substances—not cannabis (unregulated until 1937), not opium (sold in general stores), not even alcohol (ubiquitous in colonial life). The first federal drug law emerged in 1906; § 922(g)(3) followed in 1968. This 177-year gap between the Second Amendment and the first drug-based firearm ban speaks volumes: *Bruen* requires tradition, not 20th-century innovation.

45.     The federal government did not criminalize cannabis until 1937 (Marihuana Tax Act), and did not prohibit firearm possession by drug users until 1968, nearly two centuries after the Second Amendment was ratified. *See* Pub. L. No. 90-618, 82 Stat. 1213 (1968). This post-hoc innovation lacks any connection to the Second Amendment's original public meaning or historical context.

46.     Nor can Defendants identify any "relevantly similar" historical analogues that imposed a comparable burden on the right to armed self-defense, as required by Bruen. There is no historical tradition of: **(a)** Disarming individuals merely for engaging in private, non-criminal drug use; **(b)** Denying the right to keep and bear arms based on state-compliant medical treatment; **(c)** Imposing blanket firearm prohibitions without individualized findings of dangerousness.

47.     While Founding-era legislatures occasionally disarmed those perceived as threats to public safety (e.g., loyalists during the Revolution, or those adjudicated mentally ill), those policies were narrow, individualized, and tied to specific findings of dangerousness—not mere lifestyle choices or medical behavior.

*See United States v. Daniels,* 77 F.4th 337, 341 (5th Cir. 2023) (holding § 922(g)(3) unconstitutional as applied to marijuana user), *vacated and remanded,* 144 S. Ct. 2707 (2024) .

**48.**     To the contrary, the Founding generation recognized the right to bear arms as essential for law-abiding citizens to defend themselves and resist tyranny. *Bruen,* 597 U.S. at 19; *District of Columbia v. Heller,* 554 U.S. 570, 594 (2008).

**49.**     Federal courts applying *Bruen* have already struck down § 922(g)(3) or expressed deep skepticism of its constitutionality.

**50.**     In *United States v. Daniels,* 77 F.4th 337, 347–48 (5th Cir. 2023), the Fifth Circuit held that the statute violated the Second Amendment as applied to a marijuana user.

**51.**     In *United States v. Harrison,* 654 F. Supp. 3d 1191, 1193 (W.D. Okla. 2023), the court concluded that § 922(g)(3) "unconstitutionally infringes upon [the defendant's] fundamental right to possess a firearm."

**52.**     In *Range v. Att'y Gen.,* 69 F.4th 96, 106 (3d Cir. 2023) (en banc), the Third Circuit emphasized that modern prohibitions must be supported by "well-established and representative historical analogues," which § 922(g)(3) lacks.

**53.**     Unlike laws that disarm those convicted of violent crimes, § 922(g)(3) imposes a lifetime firearms ban based on ambiguous conduct and without any finding of culpability, violence, or mental impairment.

54.     The law's breadth is especially problematic given its criminal penalties: a knowing violation of § 922(g)(3) can result in up to 15 years imprisonment. 18 U.S.C. § 924(a)(8). This harsh punishment, combined with the law's vagueness and overbreadth, renders it particularly ripe for abuse and inconsistent enforcement.

55.     Because § 922(g)(3) cannot be reconciled with the text and historical understanding of the Second Amendment, and because the government cannot satisfy the burden imposed by Bruen, the statute is unconstitutional on its face.

56.     Plaintiff seeks a declaration that § 922(g)(3) is facially invalid and unenforceable under the Second Amendment.

### COUNT III
### Violation of the Second Amendment
### *As Applied Challenge to 18 U.S.C. § 922(g)(3) and 27 C.F.R. § 478.11*
### (Against Defendants Bondi and Driscoll)
### Declaratory Judgment, 28 U.S.C. § 2201

57.     Plaintiff re-alleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

58.     The Second Amendment to the United States Constitution secures to "the people" the right to keep and bear arms for lawful purposes, including self-defense. This right applies to all law-abiding, responsible citizens. *District of Columbia v. Heller,* 554 U.S. 570, 635 (2008); *McDonald v. City of Chicago,* 561 U.S. 742, 750 (2010).

59.     In *New York State Rifle & Pistol Ass'n v. Bruen,* 597 U.S. 1 (2022), the Supreme Court clarified that modern firearm regulations must be justified by the

Nation's historical tradition of firearm regulation. Any restriction that burdens the plain text of the Second Amendment is presumptively unconstitutional unless the government can demonstrate a relevant historical analogue. *Id.* at 24, 29.

60.     Plaintiff is a law-abiding citizen who resides in Arizona, a state that has enacted comprehensive legal frameworks for both medical and adult-use cannabis. A.R.S. §§ 36-2801 et seq. (medical); §§ 36-2850 et seq. (adult-use).

61.     At all times relevant to this Complaint, Plaintiff has complied with Arizona state law related to federally scheduled controlled substances.

62.     Despite this full compliance with state law, the federal government—through FPD's enforcement of 18 U.S.C. § 922(g)(3) and 27 C.F.R. § 478.11—categorically disarms Plaintiff by labeling him an "unlawful user" of a controlled substance and thereby prohibiting his possession of firearms.

63.     Under *Bruen*, this burden on Plaintiff's Second Amendment rights is presumptively unconstitutional. The burden then shifts to the government to "identify a well-established and representative historical analogue." *Id.* at 30. The government cannot meet this burden.

64.     There is no historical tradition—at the time of the Founding or the Reconstruction—of disarming individuals merely for using psychoactive substances, much less those deemed lawful by the state. Cannabis was unregulated in both federal and state law during the Founding era and remained

so until the 20th century. *See United States v. Daniels,* 77 F.4th 337, 347 (5th Cir.

2023), *vacated and remanded,* 144 S. Ct. 2707 (2024).

**65.**     Nor was there any tradition of disarming individuals for alcohol use,

despite its well-documented role in early American society. The Supreme Court in

*Bruen* did not identify any historical analogues based on substance use. Rather,

the only historically recognized justifications for disarmament involved

dangerousness, rebellion, or individualized findings of incapacity.

**66.**     Plaintiff's conduct—either his admitted conduct or that alleged by FPD—

is in accordance with Arizona law. It does not involve violence, mental illness, or

criminal conviction. There is no evidence or claim that Plaintiff is dangerous or

incapable of safely possessing firearms.

**67.**     Enforcement of § 922(g)(3) and 27 C.F.R. § 478.11 against Plaintiff thus

lacks any connection to the historically recognized bases for disarming individuals

and instead reflects a modern policy judgment that the Supreme Court in *Heller*

and *Bruen* expressly forbids. *See Heller,* 554 U.S. at 636 ("[T]he enshrinement of

constitutional rights necessarily takes certain policy choices off the table.").

**68.**     The ATF's interpretation of § 922(g)(3) in 27 C.F.R. § 478.11—which

includes "any person who is a current user of a controlled substance in a manner

other than as prescribed by a licensed physician"—fails to account for the fact that

many states have legalized marijuana, either medicinally or for adult use, outside

of the traditional prescription model. It also improperly conflates lawful use under state law with criminal conduct.

69.     The regulation further allows an "inference" of unlawful use to be drawn from events that may be unrelated to present conduct—such as a drug test taken months ago, or even an arrest without a conviction—thus creating an arbitrary and overbroad basis for denying individuals their Second Amendment rights.

70.     Plaintiff's situation is precisely the type of unconstitutional burden the *Bruen* decision condemns: a law-abiding citizen engaged in lawful conduct is nevertheless stripped of a core constitutional right under a federal regime that lacks any historical justification.

71.     The conflict between federal disarmament under § 922(g)(3) and Plaintiff's state-law compliance exacerbates the constitutional violation, as it forces citizens to choose between their Second Amendment rights and lawful participation in state medical programs.

72.     Numerous federal courts have held or suggested that applying § 922(g)(3) to non-violent marijuana users violates the Second Amendment: **(a)** In *Daniels,* the Fifth Circuit held that § 922(g)(3) violated the Second Amendment as applied to a regular marijuana user because "there is no historical tradition of disarming a person solely based on that person's use of marijuana." 77 F.4th at 340; **(b)** In *United States v. Harrison,* 654 F. Supp. 3d 1191, 1193 (W.D. Okla. 2023), the district court concluded that disarming a state-compliant marijuana user was

unconstitutional under *Bruen*; (c) In *United States v. Connelly*, 2024 WL 1554417 (W.D. Pa. Apr. 10, 2024), the court observed that state-legal cannabis use, without more, cannot serve as a basis for Second Amendment disqualification absent a historical analogue.

**73.**     In light of the above, 18 U.S.C. § 922(g)(3) and 27 C.F.R. § 478.11, as applied to Plaintiff, violates the Second Amendment.

**74.**     Plaintiff therefore seeks a declaration that § 922(g)(3) and 27 C.F.R. § 478.11 are unconstitutional as applied to persons who lawfully use or are believed to use cannabis under state law, and an injunction barring enforcement against such persons, including Plaintiff.

**COUNT IV**
**Violation of the Tenth Amendment**
***Unconstitutional Application of 18 U.S.C. § 922(g)(3) and***
***27 C.F.R. § 478.11 to State-Law-Compliant Cannabis Users***
**(Against Defendants Bondi and Driscoll)**
**Declaratory Judgment, 28 U.S.C. § 2201**

**75.**     Plaintiff re-alleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

**76.**     The United States Constitution establishes a system of dual sovereignty between the federal government and the states. *Printz v. United States,* 521 U.S. 898, 918–22 (1997); *New York v. United States,* 505 U.S. 144, 155–57 (1992). Under this system, both Congress and the executive branch must respect the states'

prerogative to regulate health, safety, and welfare—including the regulation of medical and adult-use marijuana.

77.    Arizona, like 37 other states, has legalized the use of marijuana for medical purposes. *See* A.R.S. §§ 36-2801 to 2819. Arizona voters also legalized adult-use cannabis in 2020. A.R.S. §§ 36-2850 to 2865.

78.    Plaintiff is *perceived* by FPD to (lawfully) uses cannabis under Arizona's voter-enacted medical marijuana framework. Notwithstanding that such conduct is entirely legal under state law, and Arizona has established comprehensive rules governing use, possession, dosage, and patient protections, FPD is enforcing 18 U.S.C. § 922(g)(3) and 27 C.F.R. § 478.11 against Plaintiff based on guidance issued by ATF in 2011.

79.    Since 2014, Congress has enacted annual appropriations riders (commonly known as the Rohrabacher–Farr or Joyce Amendment) that expressly prohibit the Department of Justice—including the ATF—from using federal funds to interfere with state medical marijuana programs or prosecute individuals who comply with them. *See, e.g.,* Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, § 531 (Mar. 9, 2024); *United States v. McIntosh,* 833 F.3d 1163, 1177–78 (9th Cir. 2016).

80.    By continuing to enforce 18 U.S.C. § 922(g)(3) and 27 C.F.R. § 478.11 against Plaintiff and others like him, Defendants are engaging in conduct Congress has expressly forbidden through the appropriations process. This constitutes a

violation of the Appropriations Clause, U.S. Const. art. I, § 9, cl. 7 ("No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law").

81.    Additionally, by using § 922(g)(3) to disarm individuals who are, or who appear to be, lawfully complying with state marijuana laws—while relying on ATF's expansive regulatory definitions—Defendants are indirectly criminalizing conduct that states have deliberately and democratically chosen to permit.

82.    This enforcement framework creates an unconstitutional "positive conflict" between federal and state law. *See* 21 U.S.C. § 903 ("No provision of this subchapter shall be construed as indicating an intent on the part of the Congress to occupy the field ... unless there is a positive conflict between that provision ... and that State law so that the two cannot consistently stand together.").

83.    Here, no such conflict exists. Plaintiff's perceived conduct is entirely legal under Arizona law, and Congress has disclaimed any intent to override such laws for state-compliant individuals. Yet Defendants attempt to use § 922(g)(3) and ATF's regulatory interpretation to disarm such individuals, thereby creating a de facto conflict Congress explicitly sought to avoid.

84.    Defendants' enforcement policy improperly commandeers state regulatory structures and punishes individuals for engaging in conduct encouraged, licensed, and protected by state law. This constitutes unconstitutional executive preemption of state sovereignty in violation of the Tenth Amendment.

85.     The federal government may not enact or enforce laws that effectively compel states to regulate private conduct in accordance with federal policy preferences. *Murphy v. NCAA,* 584 U.S. 453 (2018). Yet ATF's enforcement policy under § 922(g)(3) seeks to nullify Arizona's voter-enacted marijuana laws by criminalizing those who follow them.

86.     Moreover, this federal enforcement scheme severely undermines the states' traditional authority to regulate medicine, health, and public safety—areas long recognized as core functions of state sovereignty. *Gonzales v. Oregon,* 546 U.S. 243, 270 (2006).

87.     The federal government's attempt to penalize individuals for lawfully using or appearing to use cannabis under state law also violates the Spending Clause, U.S. Const. art. I, § 8, cl. 1, by disregarding the conditions Congress placed on DOJ's appropriations via Section 531 of the appropriations act. The executive branch may not spend funds in ways that frustrate or contradict Congress's duly enacted limitations. *McIntosh,* 833 F.3d at 1175–78.

88.     The result is a system in which an Arizona resident may lawfully obtain, possess, and use cannabis under the protection of state law, and under the explicit protection of federal spending laws, yet is nevertheless disarmed by ATF's administrative interpretation of § 922(g)(3).

89.     ATF's enforcement creates a *Kafkaesque trap*: Congress says, "Don't prosecute state-compliant medical users"; states say, "This use is legal"; ATF says,

"If you do, we'll still strip your gun rights." This is just *Printz* commandeering by another name—using federal gun laws to nullify state health policy.

90.      This enforcement scheme creates the very "constitutional absurdity" that federalism exists to prevent: a citizen who is protected from federal prosecution by an appropriations rider is simultaneously deprived of a fundamental constitutional right because of the same conduct.

91.      Moreover, the continued enforcement of § 922(g)(3) and 27 C.F.R. § 478.11 against Plaintiff and other (perceived or actual) state-compliant marijuana users undermines the democratic decisions of the people of Arizona, violates the Constitution's structural limitations on federal power, and represents a grave threat to the integrity of dual sovereignty.

92.      Plaintiff seeks a declaration that the application of 18 U.S.C. § 922(g)(3) and 27 C.F.R. § 478.11 to individuals lawfully using cannabis under state law violates the Tenth Amendment, the Appropriations Clause, and foundational principles of federalism.

## COUNT V
### Violation of the Administrative Procedure Act, 5 U.S.C. § 706
### (Against Defendants Bondi and Driscoll)
### Declaratory and Injunctive Relief

93.      Plaintiff re-alleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

94.     The Administrative Procedure Act (APA) empowers federal courts to "hold unlawful and set aside" agency actions that are: **(a)** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; **(b)** contrary to constitutional right, power, privilege, or immunity; **(c)** in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; or **(d)** unsupported by substantial evidence. 5 U.S.C. § 706(2)(A)-(D).

95.     Plaintiff challenges the ATF's regulatory definition of "unlawful user of or addicted to any controlled substance" in 27 C.F.R. § 478.11 on all four of these grounds.

### *Exceeds Statutory Authority*

96.     Section 922(g)(3) prohibits firearm possession by anyone "who is an unlawful user of or addicted to any controlled substance," but Congress did not define the term "unlawful user" in the statute or elsewhere in the United States Code.

97.     The Controlled Substances Act (CSA), 21 U.S.C. § 801 et seq., criminalizes the unauthorized manufacture, distribution, and possession of controlled substances—but it does not criminalize use. *See* 21 U.S.C. §§ 841–844.

98.     Congress's deliberate omission of the word "use" from the CSA's criminal provisions indicates that mere use was not intended to constitute a violation of federal drug law. *See United States v. Safehouse,* 985 F.3d 225, 253 (3d Cir. 2021)

(Roth, J., dissenting) ("'Using a controlled substance' is not 'unlawful' under federal law; possessing it is."); *Nunez-Reyes,* 646 F.3d at 708.

**99.** By defining "unlawful user" to include conduct that is not unlawful under any federal statute—such as lawful medical use, or minor deviations from a prescription—the ATF has exceeded its statutory authority and rewritten § 922(g)(3) beyond what Congress authorized. *See Loper Bright Enters. v. Raimondo,* 603 U.S. 369, 395–96 (2024) (eliminating *Chevron* deference and reaffirming that "courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority").

### Arbitrary and Capricious

**100.** The ATF's definition of "unlawful user" is a masterclass in administrative overreach. It: **(a)** invented a crime Congress omitted—the CSA bans possession, not use, yet the ATF criminalizes deviations from prescriptions; **(b)** defies logic—treats occasional unprescribed Ambien use the same as using PCP daily; and **(c)** ignores Congress's will—despite annual appropriations riders barring interference with state medical programs, the ATF still disarms compliant patients. Under *Loper Bright*, this is *ultra vires* policymaking masquerading as interpretation.

**101.** The ATF's definition of "unlawful user" in 27 C.F.R. § 478.11 is internally inconsistent, vague, and unsupported by reasoned analysis. It permits a person to be classified as an "unlawful user" even when they are not impaired, not convicted, and not using a substance at the time of possession.

102.    The regulation includes multiple examples that fail to define any clear threshold for what constitutes "current use," and instead allows ATF to infer disqualifying conduct based on: **(a)** an arrest without a conviction; **(b)** a drug test (even if later contested); **(c)** a "pattern of use" with no temporal limit; or **(d)** deviations from a prescription, however medically justified.

103.    These vague and sweeping standards lack the clarity necessary to provide meaningful guidance to the public or law enforcement, and result in arbitrary and inconsistent enforcement.

104.    Moreover, the regulation does not account for the widespread legalization of cannabis under state law or the express will of Congress, which since 2014 has barred DOJ—including ATF—from using funds to interfere with state-compliant medical marijuana programs. *See United States v. McIntosh,* 833 F.3d 1163, 1178 (9th Cir. 2016).

105.    The ATF has failed to revise or reconsider this regulation in light of profound legal and factual changes, including: **(a)** the rapid and continuing expansion of state-legal medical and adult-use marijuana regimes; **(b)** evolving public and legislative attitudes toward cannabis; **(c)** annual appropriations riders limiting enforcement authority; and **(d)** the Supreme Court's decisions in *Bruen* and *Loper Bright*.

106.    An agency's failure to consider changed circumstances or significant aspects of a regulatory problem renders its actions arbitrary and capricious. *See*

*Motor Vehicle Mfrs. Ass'n v. State Farm,* 463 U.S. 29, 43 (1983); *Am. Iron & Steel Inst. v. EPA,* 115 F.3d 979, 1007 (D.C. Cir. 1997).

### Contrary to Constitutional Rights

107.     The ATF's regulatory definition of "unlawful user" directly conflicts with the Second Amendment, as applied to Plaintiff and others who are law-abiding state-authorized users of marijuana or so-perceived.

108.     The regulation deprives such individuals of their right to keep and bear arms—often without criminal process, trial, or any individualized finding of dangerousness—and thus violates the Second and Fifth Amendments.

109.     The regulation also conflicts with principles of federalism, the Tenth Amendment, and the Spending and Appropriations Clauses, as set forth in Count IV.

110.     Under 5 U.S.C. § 706(2)(B), agency rules that contravene constitutional rights must be declared unlawful and set aside.

### APA Remedy and Jurisdiction

111.     The ATF's definition of "unlawful user" in 27 C.F.R. § 478.11 constitutes final agency action under 5 U.S.C. § 704 because it marks the consummation of the agency's decision-making process and has direct and immediate legal consequences for regulated parties.

112.     Plaintiff has no adequate alternative remedy in court to challenge this agency action except through the APA. 5 U.S.C. § 704.

113.    Plaintiff is injured by this final rule because its enforcement causes him to be designated a prohibited person under federal law, despite the fact that he is not an "unlawful user" of a controlled substance and his lack of any disqualifying criminal conviction.

114.    Vacatur is the appropriate remedy where an agency rule exceeds statutory authority, is arbitrary and capricious, or violates constitutional rights. *See Montana Wildlife Fed'n v. Haaland,* 127 F.4th 1, 36 (9th Cir. 2025).

**COUNT VI**
**Violation of the Fourteenth Amendment**
*Procedural Due Process*
**(Against Defendants Connolly and Martinet)**
**Deprivation of Rights Under Color of State Law, 42 U.S.C. § 1983**

115.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

116.    The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law."

117.    At all relevant times, Defendants Sean Connolly and Todd Martinet were employed by the City of Flagstaff Police Department (FPD). Connolly was the Chief of Police and final policymaker. Martinet was a Detective Sergeant acting under color of state law and pursuant to official FPD customs and policies.

118.    On March 31, 2025, Plaintiff lawfully purchased two firearms from Dr. James Mitchell, who had received formal release authorization for those firearms from FPD.

119.    Plaintiff notified FPD staff—including Detective Martinet—that he had acquired legal ownership of the firearms and provided a bill of sale documenting the transfer.

120.    Despite this lawful ownership and Mitchell's authorized release, FPD—through Martinet and under the authority of Connolly—refused to transfer possession of the firearms to Plaintiff. Martinet stated via email on April 9, 2025, that "we are unable to facilitate any third-party transfer or arrangement regarding the release of these firearms, regardless of any private agreement you may have with Mr. Mitchell."

121.    At no time did FPD or either Defendant provide Plaintiff with any notice of the legal grounds for denial of possession, nor did they afford Plaintiff any opportunity to contest the denial, present evidence, or obtain a neutral determination of his eligibility to receive the firearms he lawfully owns.

122.    FPD maintains no published process or policy for appealing or administratively challenging such decisions, nor was Plaintiff advised of any internal or external procedure through which he could seek review.

123.    Plaintiff has a protected property interest in firearms he lawfully owns under Arizona law. *See Fuentes v. Shevin,* 407 U.S. 67, 80 (1972) (property rights cannot be deprived without notice and opportunity for hearing).

124.    Plaintiff also possesses a liberty interest in his ability to exercise Second Amendment rights, which cannot be arbitrarily denied by municipal officers without procedural protections. *McDonald v. City of Chicago,* 561 U.S. 742, 791 (2010); *Bruen,* 597 U.S. at 20.

125.    Under the framework set forth in *Mathews v. Eldridge,* 424 U.S. 319 (1976), Plaintiff was entitled to at least: **(a)** Timely notice of the reasons he was being denied access to his own lawfully acquired property; **(b)** An opportunity to respond or contest the decision, either in writing or in a hearing; **(c)** A neutral decisionmaker capable of evaluating whether FPD's denial was lawful and justified.

126.    Plaintiff was afforded none of these minimal procedural protections. The refusal to release his firearms was made unilaterally and communicated via email, with no stated process for challenge or review.

127.    Plaintiff's state court filing—a special action for mandamus and declaratory relief—was filed only out of necessity, after FPD gave no procedural avenue to resolve the matter administratively.

128.     Defendants Connolly and Martinet, acting under color of state law and pursuant to FPD custom and policy, deprived Plaintiff of property and liberty without due process of law, in violation of the Fourteenth Amendment.

129.     The deprivation of Plaintiff's property has caused ongoing harm, including continued loss of possession, denial of access to lawfully owned firearms, and chilling of Plaintiff's constitutional rights.

**COUNT VII**
**Violation of the Second and Fourteenth Amendments**
***Monell* Claim**
**(Against Defendant City of Flagstaff)**
**Municipal Liability, 42 U.S.C. § 1983**

130.     Plaintiff re-alleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

131.     Defendant City of Flagstaff is a political subdivision of the State of Arizona and a "person" subject to suit under 42 U.S.C. § 1983.

132.     A municipality is liable under § 1983 when a constitutional deprivation results from: **(a)** An official policy or regulation; **(b)** A longstanding practice or custom that constitutes the "standard operating procedure" of the municipality; **(c)** The decision of a final policymaker; or **(d)** A failure to train or supervise employees where the need for such training is obvious and the failure amounts to deliberate indifference. *Monell v. Dep't of Soc. Servs. of City of New York,* 436 U.S. 658, 690-91 (1978); *City of Canton, Ohio v. Harris,* 489 U.S. 378, 388 (1989).

***Official Policy and/or Custom***

133.    The Flagstaff Police Department (FPD), under the direction of Defendant Connolly and acting through Detective Sergeant Martinet, has adopted and enforced policies and customs that unconstitutionally deprive individuals of their firearms and related property without due process.

134.    These policies include, but are not limited to: **(a)** Refusing to release firearms to their rightful owners—even when ownership is clearly established through a valid bill of sale—without any hearing, notice, or judicial process; **(b)** Enforcing a categorical prohibition on "third-party" firearm transfers from FPD custody, even when such transfers are not prohibited by law and are accompanied by valid legal documentation; **(c)** Refusing to disclose the factual or legal basis for withholding firearms; and **(d)** Providing no administrative process or policy for individuals to contest or appeal the denial of property release.

135.    FPD's policy and practice are evidenced by: **(a)** The March 2025 email correspondence from Martinet refusing release of Plaintiff's firearms, explicitly invoking "legal counsel" and categorically disallowing any transfer to Plaintiff regardless of ownership status; **(b)** The absence of any FPD policy or procedure providing notice, hearing, or a mechanism to contest firearm release decisions; and **(c)** The City's subsequent litigation position—asserting that Plaintiff was a prohibited possessor without any conviction, judicial finding, or due process mechanism—used to justify ongoing denial of Plaintiff's rights.

136. These policies and customs are not isolated actions, but reflect standard operating procedures authorized, implemented, or ratified by the City of Flagstaff and its final policymakers.

### *Final Policymaker Liability*

137. Defendant Sean Connolly, as Chief of Police of the Flagstaff Police Department, is a final policymaker for purposes of municipal liability in matters of property retention and firearm release under FPD custody.

138. As the official responsible for supervising the FPD's handling of seized property and approving enforcement policies, Connolly's actions—and those of his direct subordinates—constitute official municipal policy. *Pembaur v. City of Cincinnati,* 475 U.S. 469, 481–83 (1986).

139. Connolly either directed the refusal to release Plaintiff's firearms, ratified Martinet's conduct, or failed to intervene despite knowing of the constitutional violations.

140. Connolly's failure to ensure that FPD officers provide notice, hearing, or process before depriving individuals of lawfully owned property constitutes deliberate indifference to the constitutional rights of the public.

### *Causal Link*

141. The aforementioned policies, customs, and decisions of the City of Flagstaff and its final policymakers were the moving force behind the constitutional violations suffered by Plaintiff, including: **(a)** Deprivation of property

without due process in violation of the Fourteenth Amendment; **(b)** Chilling or denial of Second Amendment rights; **(c)** Arbitrary and unsupported designation of Plaintiff as a prohibited possessor based on unsubstantiated allegations.

142. Plaintiff has suffered and continues to suffer harm—including the unlawful retention of his firearms, denial of meaningful process, and violation of his constitutional rights—as a direct and proximate result of the City's unconstitutional policies and customs.

## PRAYER FOR RELIEF

143. WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants, and award the following relief:

    **a.** Declare that 18 U.S.C. § 922(g)(3) is unconstitutionally vague on its face in violation of the Fifth Amendment;

    **b.** Declare that 18 U.S.C. § 922(g)(3) is facially unconstitutional under the Second Amendment, as construed by *New York State Rifle & Pistol Ass'n v. Bruen,* 597 U.S. 1 (2022);

    **c.** Declare that 18 U.S.C. § 922(g)(3) and 27 C.F.R. § 478.11 are unconstitutional as applied to Plaintiff and other individuals who use cannabis in compliance with state law or who are perceived to do so;

d.   Declare that the enforcement of § 922(g)(3) and 27 C.F.R. § 478.11 against state-law-compliant marijuana users violates the Tenth Amendment, the Appropriations Clause, and other structural principles of federalism;

e.   Declare that 27 C.F.R. § 478.11 exceeds the ATF's statutory authority, is arbitrary and capricious, and violates the Constitution, in violation of the Administrative Procedure Act;

f.   Declare that Defendants Connolly and Martinet, acting under color of state law, deprived Plaintiff of his property and liberty interests without due process of law in violation of the Fourteenth Amendment;

g.   Declare that the City of Flagstaff's policies, practices, and customs regarding property and firearm retention are an unconstitutional municipal policy under *Monell v. Department of Social Services,* 436 U.S. 658 (1978);

h.   Enjoin Defendants Bondi and Driscoll from enforcing 18 U.S.C. § 922(g)(3) and 27 C.F.R. § 478.11 against Plaintiff and similarly situated individuals who lawfully use cannabis in compliance with state law or who are perceived to do so;

i.   Vacate and set aside 27 C.F.R. § 478.11 as ultra vires and unlawful under the Administrative Procedure Act;

j.   Enjoin Defendants Connolly and Martinet from continuing to withhold Plaintiff's lawfully owned firearms absent adequate procedural safeguards;

k.   Enjoin the City of Flagstaff from continuing to enforce property retention policies that lack constitutionally required notice, process, and appeal procedures, and require the City to adopt and implement such procedures;

l.   Award Plaintiff compensatory damages against Defendants Connolly and Martinet in their individual capacities under 42 U.S.C. § 1983 for violation of Plaintiff's constitutional rights;

m.   Award Plaintiff compensatory damages against Defendant City of Flagstaff under 42 U.S.C. § 1983 for violation of Plaintiff's constitutional rights;

n.   Award Plaintiff punitive damages against the individual defendants to deter future constitutional violations, to the extent permitted by law;

o.   Award Plaintiff his reasonable costs and expenses, including attorneys' fees (if applicable), under 42 U.S.C. § 1988, 5 U.S.C. § 504, or other applicable provisions of law; and

p.   Grant such other and further relief as the Court deems just and proper.

## **VERIFICATION**

I, Joseph McGhee, have read the foregoing Verified Complaint and know the contents thereof by personal knowledge. I know the allegations of the Verified Complaint to be true, except any matters stated therein on information and belief, which I believe to be true.

Executed under penalty of perjury this 2nd day of July, 2025

Joseph McGhee
*Pro Se Plaintiff*